**IN THE COURT OF APPEALS OF IOWA**

No. 13-1745
Filed June 25, 2014

**IN RE THE MARRIAGE OF KURT ROTHFUS AND
KATHERINE ROTHFUS**

**Upon the Petition of
KURT ROTHFUS,**
        Petitioner-Appellee,

**And Concerning
KATHERINE ROTHFUS,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Mahaska County, Lucy J. Gamon,

Judge.

        A mother appeals the physical care, visitation schedule, child support,

alimony, attorney fees, and property distribution provisions of the decree

dissolving her marriage to the child's father.  **AFFIRMED AS MODIFIED AND**

**REMANDED.**

        Robert Conrad of Conrad Law Office, Knoxville, for appellant.

        David D. Dixon of Heslinga, Dixon, Moore & Hite, Oskaloosa, for appellee.

        Considered by Vaitheswaran, P.J., and Tabor and Bower, JJ.

**TABOR, J.**

In dissolving the ten-year marriage of Kathy and Kurt Rothfus, the district court described Kathy as a "free spirit" and awarded physical care of their nine-year-old son to Kurt. On appeal, Kathy contests that award, as well as the court's rulings on child support, alimony, and the property equalization payment. Finally, Kathy contends the court should have required Kurt to pay a larger portion of her trial attorney fees.

After reviewing the record de novo, we conclude it is in the best interest of their son for Kathy and Kurt to have joint physical care. We remand to the district court to formulate a parenting schedule and recalcule child support. We also find rehabilitative alimony would be equitable and appropriate to assist Kathy in increasing her earning capacity. We affirm all other portions of the decree.

## I.      Background Facts and Proceedings

Kurt and Kathy were married in May 2002. They have one child together, J.R., who was born in September 2004. On May 7, 2012, Kurt filed a petition for dissolution of marriage.

At the time of trial, Kurt was forty-four years old, in relatively good health, and had been employed as a lineman at CenturyLink for the last sixteen years. The district court found he earned $68,652 annually. He took classes at DMACC to qualify for his current job, but did not receive a degree. Kurt has a strong relationship with J.R. and is engaged in his son's activities, including coaching his sports teams.

Kurt testified at trial about the breakdown of the marriage, and alleged Kathy had engaged in two extra-marital affairs. He also testified that she proposed they have an "open marriage" where they would both see other people.

Kathy was thirty-six years old at the time of trial. Kathy has taken roughly a semester of college classes and testified she would like to obtain a college degree. Currently she works as a youth coordinator for the YMCA in Oskaloosa, earning $22,601 annually. She has endured health problems, including migraines, anxiety, and depression. Kathy testified she suffered from "postpartum psychosis" following J.R.'s birth. She was so incapacitated by the illness that a family friend came to care for the infant during the day, and Kurt would take care of J.R. when he got home from work. Kathy gradually recovered by the time J.R. reached age two and eventually bonded with her son. She still suffers from migraines, anxiety, and depression, but she sees a therapist and takes medication under proper medical supervision. Kathy is now very active in J.R.'s life, volunteering at his school, reading, and playing board games with him. He also attends after-school and summer programs at the YMCA where Kathy works.

J.R. was nine years old at the time of trial. Both parents agreed he was doing well at home and in school. J.R. participated in his school's talented-and-gifted program and received good grades. He was described as engaging and well-adjusted, and interacted easily with both adults and children. He was active in sports and enjoyed a number of hobbies.

Kathy and Kurt agreed on joint legal custody. Kurt asked for physical care of J.R., while Kathy asked for joint physical care or, in the alternative, that she be the physical care provider. The court did not issue a temporary custody order. Instead the parties developed their own parenting schedule and were able to successfully abide by it. The parties could not reach an agreement on support or division of assets.

The district court held trial on August 14 and 15, 2013. On September 12, 2013, the district court issued its decree, granting Kathy and Kurt joint legal custody of J.R. and placing physical care with Kurt. Kathy received visitation every other weekend and one midweek overnight visit during the off week. The court ordered Kathy to pay $223.83 per month in child support to Kurt. Neither party was awarded alimony. The court directed Kurt to pay $2500 of Kathy's trial attorney fees and $9649 to equalize the property division.

Kathy filed a motion to enlarge and amend under Iowa Rule of Civil Procedure 1.904(2). The motion asserted, among other things, that the court overlooked the fact "the parties have handled the joint physical care appropriately" and the court appeared to have "use[d] fault as a basis for the denial of alimony." Kurt resisted. The district court amended its ruling to require Kurt to refinance the homestead within three years of the decree to remove Kathy from the mortgage and to retract portions of its alimony discussion concerning college financing available to Kathy that was not discussed in the record.

Kathy now appeals.

## II.    Standard of Review

We review de novo claims arising from a decree dissolving a marriage.  *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007).  "We give weight to the findings of the district court, especially to the extent credibility determinations are involved."  *Id.*  We give the district court considerable discretion in awarding alimony; we will disturb the court's ruling only when there has been a failure to do equity.  *In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998).  We review the district court's award of attorney fees for abuse of discretion.  *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006).

## III.    Analysis

### A.  Physical Care

Kathy seeks joint physical care of J.R.  She points out J.R. has thrived under the joint physical care arrangement that she and Kurt created and followed for more than one year before the dissolution trial.  She contends the district court's decision to award physical care to Kurt can be explained by the court's references to her extramarital affairs.

Custody decisions should assure a child of divorce the "maximum continuing physical and emotional contact with both parents" insofar as is reasonable and in the child's best interest.  Iowa Code § 598.41(1)(a).  In this case, the decree's grant of physical care to Kurt—with traditional visitation to Kathy—significantly reduced J.R.'s continuing contact with Kathy.

"Joint physical care" means both parents have "rights and responsibilities toward the child including but not limited to shared parenting time with the child,

maintaining homes for the child, providing routine care for the child and under which neither parent has physical care rights superior to those of the other parent." Iowa Code § 598.1(4). Joint physical care is neither disfavored nor preferred over placing primary care with one parent. *Hansen*, 733 N.W.2d at 692. Physical care determinations should not focus on perceived fairness to the spouses, but rather strive to place the child in the environment most likely to promote the child's long-term physical and emotional health. *Id.* at 695. When deciding if joint physical care is appropriate, courts must look to the following factors: (1) the stability and continuity of care giving, (2) the ability of the parties to communicate and show mutual respect, (3) the degree of conflict between the parties, and (4) the degree of agreement about their approach to daily child-rearing matters. *Id.* at 697–99.

Our examination of these four factors leads us to the conclusion that joint physical care is in J.R.'s best interest. First, spending roughly equal time with both parents would approximate the schedule to which J.R. has become accustomed. In concluding Kurt has been the primary caregiver, the district court placed unnecessary focus on Kathy's postpartum depression and underrated the strides she has made in the intervening years. Excluding the early months of J.R.'s life when his mother's illness limited her ability to care for him, the parents have each pitched in to ensure that J.R.'s day-to-day needs are met. Although Kurt testified in recent years Kathy would retreat to her bedroom after the evening meal, Kathy explained she did so to avoid conflict with Kurt, and J.R.

knew he was welcome to find her there and often joined her to read or play games.

Second, as the district court found, Kathy and Kurt "communicate well enough that they have made a shared care plan work for the last 14 and a half months." Third, again in the words of the district court, "the parties seem to be experiencing the fairly normal level of conflict to be expected when parties are involved in a protracted custody battle." And fourth, the record does not reveal any major differences in the parents' approach to raising J.R. They both live in the same community, and both are involved with J.R. and encourage his school work and extracurricular pursuits.

By all accounts J.R. is well-behaved, excelling in school, and active in sports and other hobbies. The decree states:

> In the last year of [J.R.]'s life, his parents have shared care evenly, and this arrangement has appeared to work reasonably well. The parties have accommodated each other's needs for schedule changes, and have not had any major disagreements with respect to [J.R.]'s care. [J.R.] is certainly thriving under the current arrangement.

We do not see any reason to change what is working.

Kathy argues the district court "spent an inordinate amount of time addressing [her] 'illicit extra martial affairs.'"[1] One of the several references in the decree stated:

> It appears to the Court that Katherine has essentially done what she liked during the course of this marriage, and at times has been thoughtless about the consequences for [J.R.]. Katherine has a bit of 'free spirit' about her. She has not been employed during

---

[1] The district court specifically calls the affairs "illicit"—placing a moral value on Kathy's alleged conduct.

the marriage until the last two years, and she nearly lost her first job, as a Christian education director, when the church learned she had been having an affair with an elder in the church.

We agree the district court's consideration of Kurt's testimony on this point may have influenced its physical care decision. Iowa has long been a no-fault-divorce state. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 103 (Iowa 2007). In custody determinations, we only consider a party's indiscretions if the child was harmed by that behavior. *See In re Marriage of Wilson*, 532 N.W.2d 493, 495 (Iowa Ct. App. 1995) ("Although 'moral misconduct' is a consideration in custody determinations, it is only one factor."); *In re Marriage of Grandinetti*, 342 N.W.2d 876, 879 (Iowa Ct. App. 1983) (stating moral misconduct has been weighed "most heavily only in those cases where the misconduct occurred in the presence of the children"). We do not use custody as a reward or punishment for the parents' past behavior. *See Spotts v. Spotts*, 197 N.W.2d 370, 371 (Iowa 1972). We find nothing in the record to indicate the alleged affairs harmed J.R. in any way other than affairs normally damage any family dynamic.

J.R. is privileged to have two loving, devoted, and highly capable parents who wish to provide a home for him. We find these circumstances lend themselves to joint physical care. Our decision in no way diminishes Kurt's commendable commitment to J.R.'s well-being. We simply believe it is in the child's best interest to have the opportunity for maximum continuing contact with both parents. *See In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000) (noting such contact can be assured by means other than a traditional, alternating-weekends visitation schedule); *In re Marriage of Hopkins*,

453 N.W.2d 232, 235 (Iowa Ct. App. 1990) (affirming "[c]hildren of dissolution have a need to maintain meaningful relationships with both parents").

We find the plan used by the parties during the pendency of this case or a similar arrangement to be appropriate going forward, so J.R. spends as much time as possible with both parents. We remand to the district court for an order on scheduling, taking into account what works best for the parties and best suits J.R.'s schedule. During the remand hearing, the district court should also recalculate child support based on the new physical care assignment.

### B. Spousal Support

The district court did not award spousal support, otherwise known as alimony. On appeal, Kathy argues she is entitled to rehabilitative alimony. She started college before the marriage, but stayed home during most of the marriage. She contends a college degree would help her increase her earning capacity. At trial, she asked for alimony in the amount of $1500 per month until January 1, 2014; then $2500 per month for three years; and then $1500 per month for an additional five years.

Alimony is a stipend to the former spouse in place of the other spouse's legal obligation to financially provide for him or her. *Hansen*, 733 N.W.2d at 702. An alimony award is not an absolute right but depends on both the circumstances of each case and the factors in Iowa Code section 598.21A(1).[2]

---

[2] The statutory factors include the length of the marriage, the age and health of the parties, the property distribution, the parties' education levels and earning capacities, the feasibility of the party seeking maintenance to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, the tax consequences, and other pertinent considerations. Iowa Code § 598.21A(1).

*In re Marriage of Hazen*, 778 N.W.2d 55, 61 (Iowa Ct. App. 2009). Rehabilitative alimony is one of three types of alimony recognized in Iowa.[3] *In re Marriage of Anliker*, 694 N.W.2d 535, 540 (Iowa 2005). Rehabilitative alimony was "conceived as a way of supporting an economically dependent spouse through a limited period of re-education or retraining following divorce, thereby creating incentive and opportunity for that spouse to become self-supporting." *Id.* at 540–41 (citing *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989)).

Kathy testified she would "love to have a degree" and researched the expense of attending William Penn College in Oskaloosa. She presented a trial exhibit estimating her college expenses would total $40,780 for three years. The exhibit contemplated she would quit her job and attend school full time. She believed obtaining a college diploma would help increase her income and make her better able to support herself and her son. She testified that in writing grants for her current position at the YMCA she has "almost written herself out of the job." She further testified, "I have no doubt I'm capable of what I'm doing, but I don't have that piece of paper."

In the decree, the district court doubted the seriousness of Kathy's intent to obtain her degree. The court noted she did not testify to her plans to pursue any particular major or any potential career options. The court also questioned why Kathy did not pursue the possibility of higher education when she was "living for free in the marital home." Kurt argues the district court was correct in declining to award rehabilitative alimony because Kathy's employer testified

---

[3] The other two types are traditional and reimbursement, neither of which is being requested here.

Kathy has the necessary skills for her current position at the YMCA and that job was secure.

We are guided by the principle that the primary goal of rehabilitative alimony is self-sufficiency. *See In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998) (rejecting argument that wife gained sufficient clerical skills in high school to become self-supporting). The parties were married for ten years. Kathy did not enter the work force for the first eight years of the marriage. The record shows Kathy is barely meeting her expenses on her current income and could advance her career with additional education. By comparison, Kurt received the community college training necessary for his career as a telecommunications technician, and has the capacity to earn more than three times more per year than Kathy. We also note Kathy received considerably less marital assets in the decree and the court allowed Kurt to make the equalization payment by monthly installments.

We find an award of monthly support aimed at helping Kathy transition to greater self sufficiency would be equitable under these circumstances. Therefore, we modify the decree to award Kathy rehabilitative alimony in the amount of $1000 per month for four years to defray her college expenses and the possible reduction in her income while she is attending classes.

### C. Property Settlement

Kathy argues the property distribution was not equitable. An "equitable division" of the property of a marriage does not necessarily mean an "equal

division" of each asset. *Hazen*, 778 N.W.2d at 59. Instead the focus is on what is fair to both parties under the circumstances. *Id.*

In this case the parties agreed upon the valuation of the assets, including Kurt's pension plan. Kathy will have access to the portion accrued during the marriage based on the *Benson*[4] formula. The district court awarded assets to Kurt with a net value of $21,737 and assets to Kathy with a net value of $2439. The court then ordered Kurt to make an equalization payment of $9649 to Kathy. The court allowed Kurt to pay installments of $500 a month until it is paid in full.

Kathy argues she should have been awarded a "lump sum immediately payable" to avoid inequity in the property division. She cites the shortfall between her salary and her expenses.

We believe that disparity will be eased by our modification of the decree to award Kathy rehabilitative alimony. The court's recalculation of child support in light of our joint-physical-care modification also will make a difference to Kathy's finances. Accordingly, we affirm the district court's property division and the allowance for Kurt to make the equalization payment by monthly installments.

### D. Attorney Fees

Finally, Kathy challenges the district court's award of trial attorney fees as too stingy. We review the district court's grant or denial of trial attorney fees for an abuse of discretion. *In re Marriage of Kimbro*, 826 N.W.2d 696, 704 (Iowa 2013). The district court carefully analyzed the parties' legal bills and their

---

[4] *In re Marriage of Benson*, 545 N.W.2d 252, 255 (Iowa 1996)

relative abilities to pay.  We conclude the district court did not abuse its discretion in the amount of trial attorney fees awarded to Kathy.

### E.  Conclusion

To recap, we affirm the dissolution decree as modified.  We remand the case to the district court to determine a joint-physical-care arrangement and recalculate child support.  We award Kathy rehabilitative support of $1000 per month for four years.  We do not disturb the district court's ruling regarding the equalization payment or attorney fees.

The costs of these proceedings should be split evenly between the parties.

**AFFIRMED AS MODIFIED AND REMANDED.**